*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TYLER MALIEK ALLEN,

        Defendant-Appellant.

UNPUBLISHED
May 14, 2020

No. 345977
Oakland Circuit Court
LC No. 2017-262250-FC

Before: JANSEN, P.J., and METER and CAMERON, JJ.

PER CURIAM.

Defendant, Tyler Maliek Allen, appeals his jury trial convictions of first-degree felony murder, MCL 750.316(1)(b); two counts of armed robbery, MCL 750.529; assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84(1)(a); conspiracy to commit armed robbery, MCL 750.157a, MCL 750.529; and four counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Allen was sentenced to life imprisonment without the possibility of parole for his first-degree felony murder conviction, 25 to 50 years' imprisonment for each of his armed robbery convictions, 4 to 10 years' imprisonment for his AWIGBH conviction, 25 to 50 years' imprisonment for his conspiracy to commit armed robbery conviction, and two years' imprisonment for each of his felony-firearm convictions. We affirm.

## I. FACTUAL BACKGROUND

The convictions arise from a shooting death and robbery in Southfield, Michigan, on January 15, 2017. Allen and Jalen Smith were friends from school who reconnected in November 2016.[1] On January 13, 2017, they exchanged text messages which suggested that Smith believed

---

[1] Smith was originally charged as a codefendant in this case, but he pleaded guilty to second-degree murder, MCL 750.317; two counts of armed robbery; one count of conspiracy to commit armed robbery; and three counts of felony-firearm.

he had an opportunity to make money, but he needed a gun. Allen responded that he had a gun. On January 15, 2017, Allen traveled from his home in Detroit, Michigan, to Smith's home in Southfield. From there, Smith called the homicide victim on his cell phone and arranged to purchase marijuana from him. The homicide victim and the robbery victim[2] drove to meet Smith outside of a condominium building in Southfield. While Smith spoke with the homicide victim at the driver's side of the vehicle, Allen approached the robbery victim on the passenger side. Allen pointed a gun at the victims and demanded that they give him "everything." The homicide victim shifted the car into drive, and then began to pull away. Allen fired a single shot, which struck the homicide victim in the head and killed him. The car struck and drove up a fence, flipped onto its side, and finally landed on its hood.

Law enforcement was contacted, and Allen and Smith left the scene. Telephone location data established that Allen and Smith were both in the same area in Detroit less than two hours after the crimes were committed. Additionally, Smith sent a text message to Allen in which Smith promised not to turn Allen in for shooting a gun in his direction. Allen and Smith continued to exchange text messages and cell phone calls until Smith was arrested.

On January 17, 2017, the robbery victim identified Allen from a photographic lineup prepared by police, and police obtained Allen's cell-phone location evidence via a court order under the Stored Communications Act, 18 USC 2701 *et seq*. The police relied on those records to track Allen to a friend's house and arrest him as he left. The police then seized Allen's cell phone and forensically removed the data, which included several photographs of guns and Allen holding guns.

Allen was charged with first-degree felony murder; two counts of armed robbery; assault with intent to commit murder, MCL 750.83; conspiracy to commit armed robbery; and four counts of felony-firearm. Before trial, Allen sought to suppress the evidence of the robbery victim's identification and the data and photographs from his cell phone. The trial court denied those motions. At trial, Allen asserted that he was not the person who committed the crimes. Allen challenged the robbery victim's identification by calling an expert witness regarding eyewitness identification and memory, who testified that the robbery victim was likely guessing when he identified Allen. Allen also presented alibi testimony that he was at a birthday party in Detroit on the day, and leading into the night, of the crimes.

The jury convicted Allen as charged, with the exception of the charge of assault with intent to commit murder, for which he was convicted of the lesser included offense of AWIGBH. Allen was sentenced to the terms of imprisonment as listed above. This appeal followed.

## II. JURY ISSUES

In a pro se supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Allen argues that he is entitled to a new trial because of errors with the jury.

---

[2] Although the homicide victim and the robbery victim were both victims of armed robbery, we refer to only one of the victims as "the robbery victim" for purposes of distinguishing the victims.

## A. FAIR CROSS-SECTION OF THE COMMUNITY

Allen first argues that the venire was not a fair cross-section of the community in violation of his constitutional rights, or alternatively, that defense counsel was ineffective for failing to object to that issue. We disagree.

### 1. PRESERVATION AND STANDARDS OF REVIEW

"[T]o properly preserve a challenge to the jury array, a party must raise this issue before the jury is empaneled and sworn." *People v McKinney*, 258 Mich App 157, 161; 670 NW2d 254 (2003). There is no allegation that Allen objected to the jury pool on the basis of a challenge that it was not a fair cross-section of the community at any point during the proceedings. Thus, this issue is not preserved for this Court's review. See *id*.

"Unpreserved claims of constitutional error are reviewed for plain error affecting a defendant's substantial rights." *People v Brown*, 326 Mich App 185, 192; 926 NW2d 879 (2018), amended ___ Mich App ___ (2019) (Docket No. 339318). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). In order to show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted).

As to Allen's alternative argument that defense counsel was ineffective, Allen failed to raise an ineffective assistance of counsel claim in the trial court in connection with a motion for a new trial or a *Ginther*[3] hearing. *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015). Therefore, our review of this issue is limited to mistakes apparent from the record. *People v Johnson*, 315 Mich App 163, 174; 889 NW2d 513 (2016).

### 2. LAW AND ANALYSIS

"A defendant has the right to be tried by an impartial jury drawn from a fair cross section of the community." *Jackson*, 313 Mich App at 428, citing US Const Am VI; Const 1963, art 1, § 20; *People v Bryant*, 491 Mich 575, 595; 822 NW2d 124 (2012). In *Bryant*, our Supreme Court reiterated the framework for considering alleged violations of that right, which was initially espoused by the United States Supreme Court in *Duren v Missouri*, 439 US 357, 364; 99 S Ct 664; 58 L Ed 2d 579 (1979):

> In *Duren*, the United States Supreme Court set forth a more substantive framework designed to evaluate fair-cross-section challenges. Specifically, to

---

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

make a prima facie case of a violation of the Sixth Amendment's fair-cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. [*Bryant*, 491 Mich at 596-597.]

Our Supreme Court held that, in considering the second prong of the above analysis, "a court must examine the composition of jury pools and venires over time using the most reliable data available to determine whether representation is fair and reasonable." *Id*. at 599-600. In this case, Allen has not provided any such statistical data or analyses. To the contrary, Allen's sole argument is that his own personal jury pool was improper because the only potential juror who was black was stricken from it. Absent any statistics on which to rely, we cannot possibly analyze this issue. "As the appellant [], [Allen] b[ears] the burden of furnishing [this] court with a record to verify the factual basis of any argument upon which reversal [is] predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). Because Allen has failed to do so here, we conclude that he is not entitled to relief on this issue. See *id*.[4]

Allen alternatively argues that defense counsel was ineffective for failing to object to the jury venire. "Criminal defendants have a right to the effective assistance of counsel under the United States and Michigan Constitutions." *People v Schrauben*, 314 Mich App 181, 189-190; 886 NW2d 173 (2016), citing US Const, Am VI; Const 1963, art 1, § 20. "However, effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *Schrauben*, 314 Mich App at 190. The United States Supreme Court has held that "in order to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Jackson*, 313 Mich App at 431, quoting *Strickland*, 466 US at 690. "Next, the defendant must show that trial counsel's deficient performance prejudiced his defense—in other words, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Jackson*, 313 Mich App at 431, quoting *Vaughn*, 491 Mich at 669.

---

[4] To the extent that Allen is attempting to raise a challenge under *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), we conclude that the issue is not properly before us and was waived. Nonetheless, to the extent that we have considered the argument, we conclude that it lacks merit.

This Court will not find trial counsel to be ineffective where an objection would have been futile; nor will it second-guess matters of trial strategy. *People v Thomas*, 260 Mich App 450, 457; 678 NW2d 631 (2004); *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999). "The defendant 'bears the burden of demonstrating both deficient performance and prejudice[;] the defendant [also] necessarily bears the burden of establishing the factual predicate for his claim.' " *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015), quoting *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (alteration in *Cooper*).

As discussed, Allen has failed to provide this Court with any statistical data or analyses to support his argument that his right to have a jury selected from a fair cross-section of the community was violated. Allen was required to provide that statistical data in order to prove a violation of his constitutional right. *Bryant*, 491 Mich at 599-600. Having failed to do so, Allen also has failed to create the factual predicate for his claim of ineffective assistance of counsel. *Cooper*, 309 Mich App at 80. Specifically, without the statistics, Allen cannot prove that defense counsel was ineffective for failing to object to the jury venire. *Id*. Consequently, we conclude that Allen is not entitled to relief on his claim of ineffective assistance of counsel.

## B. SWEARING-IN THE JURY

Allen also argues that there were issues with the trial court's swearing-in of the jury, or alternatively, that defense counsel was ineffective for failing to object to the issue. We disagree.

### 1. PRESERVATION AND STANDARDS OF REVIEW

In order to preserve an argument that the jury was not properly sworn, a defendant must provide a timely objection. *People v Cain*, 498 Mich 108, 114; 869 NW2d 829 (2015). There is no dispute in this case that Allen did not object to the language of the oath used to swear-in the jury. Thus, this issue is not preserved for this Court's review, and we review for plain-error affecting substantial rights. See *Cain*, 498 Mich at 114-115.

In order to preserve Allen's alternative argument that defense counsel was ineffective, Allen was required to "move the trial court for a new trial or a *Ginther* hearing." *Jackson*, 313 Mich App at 431. Because Allen did neither, this issue is unpreserved, see *id*., and our review "is limited to mistakes apparent on the record," *Johnson*, 315 Mich App at 174.

### 2. LAW AND ANALYSIS

"After the jury is selected and before trial begins, the court must have the jurors sworn." MCR 6.412(F). "[MCR] 2.511 govern[s] the procedure for selecting and impaneling the jury." MCR 6.412(A). The jury must be sworn by the clerk substantially as follows:

> "Each of you do solemnly swear (or affirm) that, in this action now before the court, you will justly decide the questions submitted to you, that, unless you are discharged by the court from further deliberation, you will render a true verdict, and that you will render your verdict only on the evidence introduced and in accordance with the instructions of the court, so help you God." [MCR 2.511(H)(1).]

"The oath imposes on the jurors three duties: (1) to 'justly decide the questions submitted,' (2) to 'render a true verdict,' and (3) to do these things 'only on the evidence introduced and in accordance with the instructions of the court.' " *Cain*, 498 Mich at 121, quoting MCR 2.511(H)(1).[5] In *Cain*, 498 Mich at 121-122, our Supreme Court held that the failure to read the instructions verbatim from the court rule was not a plain error requiring a new trial, so long as the instructions that actually were given satisfactorily apprised the jurors of the three duties listed above. The *Cain* Court reasoned that although the trial court failed to read the language of the court rule exactly, "we have no reason to believe that the jurors in this case as a result of these alternative efforts to inculcate in them a proper sense of their obligations did not understand the dignity and solemnity of the proceedings." *Id*. at 123-124.

In this case, Allen argues that the trial court erred by failing to require the jurors to raise their right hand while being sworn and by improperly reading the jury oath. A review of the transcript reveals that the following occurred:

> *The Court*: Okay. The folks whose names have not been called, I'd ask you to please stay where you are for just a moment and I'd ask the 14 of you to please stand and raise your right hands to be sworn as the jury in the case.

> *The Clerk*: Do you swear that will [sic] and truly try [sic] the issue pending before the Court and unless discharged by the Court render a true verdict and you will do so solely on the evidence introduced and in accordance with the instructions of the Court so help you God, if so say "I do".

> *Jurors*: I do.

Afterward, while beginning to read the preliminary jury instructions, the trial court informed the jurors that he was giving them a printed copy of the oath and that they should "[j]ust keep it in mind that that pertains and—throughout the case obviously."

First, addressing the allegation by Allen that the trial court failed to instruct the jurors to raise their right hands, the record clearly supports that the trial court did indeed tell the jurors to "raise [their] right hands to be sworn as the jury . . . ." Thus, Allen's argument is without factual merit, and he is not entitled to relief on this issue.

Allen also argues that the trial court erred by not correcting the misreading of the oath. As quoted above, the oath was read using substantially similar language to MCR 2.511(H)(1). More importantly, the jurors were instructed on the three important duties on which our Supreme Court in *Cain*, 498 Mich at 121, was most focused. Specifically, the jurors swore that they would "truly

---

[5] While the statute regarding swearing-in a jury, MCL 768.14, contains different language for the oath, the three duties imposed upon the jurors remain the same. "You shall well and truly try, and true deliverance make, between the people of this state and the prisoner at bar, whom you shall have in charge, according to the evidence and the laws of this state; so help you God." We rely on the language of MCR 2.511(H)(1), rather than the statute, because our Supreme Court also relied on the court rule in *Cain*, 498 Mich at 121-122.

try the issue pending before the Court," "render a true verdict," and would "do so solely on the evidence introduced and in accordance with the instructions of the Court . . . ." Those instructions are substantially similar, and at times identical, to the three duties discussed by our Supreme Court—that a jury must swear "(1) to 'justly decide the questions submitted,' (2) to 'render a true verdict,' and (3) to do these things 'only on the evidence introduced and in accordance with the instructions of the court.' " *Cain*, 498 Mich at 121, quoting MCR 2.511(H)(1). Although they swore to a slightly misworded oath, it was appropriate in substance. The jurors were also provided with a physical copy of the oath and were told by the trial court to keep that oath in mind throughout the case. In light of these facts, like in *Cain*, 498 Mich at 121-124, there is no reason to believe that the jury in this case did not fully comprehend and abide by the duties they swore to uphold. Consequently, there was no plain error requiring reversal in this case. *Id*.

Allen alternatively argues that defense counsel was ineffective for failing to object to the alleged errors with the jury oath. However, as just discussed, Allen's allegations of error were without merit, meaning that any objection by defense counsel would have been futile. This Court will not find counsel to be ineffective where a proposed objection would have been without merit if made. *Thomas*, 260 Mich App at 457. Thus, Allen's alternative argument of ineffective assistance of counsel also lacks merit. See *id*.

## III. SUFFICIENCY OF THE EVIDENCE

Allen, in his Standard 4 brief, argues that there was insufficient evidence to sustain his first-degree felony murder, armed robbery, and conspiracy to commit armed robbery convictions. We disagree.

### A. STANDARD OF REVIEW

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016), quoting *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine 'whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013), quoting *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015), quoting *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

### B. LAW AND ANALYSIS

There is sufficient evidence for a guilty verdict where "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Tennyson*, 487 Mich at 735. (citation omitted.) "The prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014), overruled in part on other grounds by *People v Reichard*, ___ Mich ___; ___ NW2d ___ (2019). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements

of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016). Any and all conflicts that arise in the evidence must be resolved "in favor of the prosecution." *Henderson*, 306 Mich App at 9. "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

> Allen was convicted of first-degree felony murder, the elements of which are
>
> (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b). [*People v Bass*, 317 Mich App 241, 267; 893 NW2d 140 (2016), quoting *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009).]

Two of the predicate crimes for first-degree felony murder, MCL 750.316(1)(b), are "larceny of any kind" and "robbery", which were the predicate felonies listed in Allen's third-amended general information.

> Allen also was convicted of armed robbery. This Court recently restated "[t]he elements necessary to prove armed robbery under MCL 750.529" in *People v Muhammad*, 326 Mich App 40, 61; 931 NW2d 20 (2018) (citation omitted):
>
> (1) [T]he defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon.

Pertinently, the armed robbery statute requires the commission or attempted commission of "a larceny of any money or other property . . . ." *Id.* See also *People v Williams*, 491 Mich 164, 183; 814 NW2d 270 (2012) (holding that a defendant "may be guilty of armed robbery even if the larcenous taking is not completed.").

> Allen also challenges his conviction of conspiracy to commit armed robbery. "A criminal conspiracy is a partnership in criminal purposes, under which two or more individuals voluntarily agree to effectuate the commission of a criminal offense." *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011). Stated differently, "[t]he crime of conspiracy involves a defendant's course of conduct and is based upon an unlawful agreement between coconspirators." *People v Grant*, 455 Mich 221, 236; 565 NW2d 389 (1997). "Conspiracy is a specific-intent crime, because it requires both the intent to combine with others and the intent to accomplish the illegal objective." *People v Mass*, 464 Mich 615, 629; 628 NW2d 540 (2001). "Thus, there must be proof showing that the parties specifically intended to further, promote, advance, or pursue an unlawful objective." *Jackson*, 292 Mich App at 588 (quotation marks and citation omitted). However,

"[d]irect proof of a conspiracy is not required; rather, proof may be derived from the circumstances, acts, and conduct of the parties." *Id*. (quotation marks and citation omitted).

Allen's first argument is generally to all four of the challenged convictions. Specifically, Allen asserts that there was insufficient evidence of his identity as the perpetrator of the crimes. "[I]t is well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). "[T]his Court has stated that positive identification by witnesses may be sufficient to support a conviction of a crime," and that "[t]he credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000). A perpetrator's identity can be established by evidence that is entirely "circumstantial and sometimes requires reliance on an inference founded on an inference . . . ." *Bass*, 317 Mich App at 264. Moreover, "[e]ven in a case relying on circumstantial evidence, the prosecution need not negate every reasonable theory consistent with the defendant's innocence, but need merely introduce evidence sufficient to convince a reasonable jury in the face of whatever contradictory evidence the defendant may provide." *People v James*, 327 Mich App 79, 87; 932 NW2d 248 (2019) (quotation marks and citation omitted).

There was sufficient evidence that Allen agreed with Smith that he would commit an armed robbery with him and that Allen attempted to rob both of the victims and that he shot and killed the homicide victim. During trial, Allen admitted that the cell phone number that had been used in conversations with Smith belonged to Allen, and he also acknowledged sending and receiving text messages to and from Smith. The police performed forensic examinations of both Allen's and Smith's cell phones, which revealed a conversation between Smith and Allen that implied that the two were setting up an armed robbery. Specifically, two days before the crimes were committed, Smith sent a text message to Allen asking him if he had "scrap," which a police officer testified meant a weapon or gun. Allen responded affirmatively, and asked why Smith was interested. Smith responded that he might have a "play." On the day of the crime, Allen and Smith exchanged cell phone calls on a number of occasions. Most importantly, Smith sent Allen a text message with the address for the Kingswood Condominiums—the same address Smith gave to the homicide victim in order to effectuate the marijuana transaction. According to Allen's cell phone location records, he traveled from his home in Detroit to Southfield, where he remained until the crimes were committed. This circumstantial evidence supports that Smith and Allen made an agreement to commit an armed robbery. They discussed whether Allen would bring a gun to effectuate the crime, Smith told Allen where to go, and Allen actually traveled to the location. That evidence was sufficient to establish that Allen agreed to commit armed robbery, thereby satisfying the identity element of conspiracy to commit armed robbery. See *Jackson*, 292 Mich App at 588.

This evidence was also relevant to establish Allen's identity as the person who actually committed the armed robberies and the first-degree felony murder. Specifically, Allen and Smith discussed bringing a weapon for a "play," Smith sent Allen the address where the robberies and the murder occurred, and Allen traveled to that same area about two hours before the crimes occurred. Additionally, at trial, the robbery victim identified Allen as the person who pointed the gun at him, demanded everything in the vehicle, and then shot the homicide victim when he attempted to drive away. The robbery victim also identified Allen in a photographic lineup two days after the crime, which was admitted as evidence at trial.

Allen asserts that the robbery victim's identification was not credible for several reasons, which will be discussed in greater depth later in this opinion. However, it is undisputed that the jury was well aware of the factors suggesting that the robbery victim's recollection of the identity of the shooter could be inaccurate. Most importantly, the jury heard significant testimony from an expert in eyewitness identification and memory. Despite being aware of all of the mitigating factors regarding the reliability of the robbery victim's memory, the jury still chose to believe the robbery victim's testimony. As this Court has held, "[t]he credibility of identification testimony is a question for the trier of fact that we do not resolve anew." *Davis*, 241 Mich App at 700.

In addition to the eyewitness testimony identifying Allen as the perpetrator of these crimes, there was also circumstantial evidence of Allen's identity. As already discussed, there was evidence presented from which an inference could be made that Allen discussed robbing the homicide victim with Smith, obtained the address where the robbery was to occur from Smith, and then traveled there. Also, Allen's cell phone data revealed that Allen's cell phone was in the area of the crime scene until after it was committed. There was also evidence that Smith's car arrived at a parking lot within walking distance of the scene of the crimes minutes before the crimes occurred, and then left that parking lot several minutes later. Based on this evidence, a reasonable jury could infer that Allen was in the car with Smith at the time.

Allen contends that the circumstantial evidence only established that he was in the vicinity of the crimes when they were committed, not that he actually committed them, and thus, was not sufficient to sustain his convictions beyond a reasonable doubt. Even disregarding that Allen ignores the other significant evidence of his identity as the perpetrator of the crimes in this case, his argument is also without merit because Allen's presence in the area allowed for an inference that he had an opportunity to commit the crimes. As this Court has held, "[e]vidence of opportunity is logically relevant in a prosecution for murder." *People v Unger*, 278 Mich App 210, 224; 749 NW2d 272 (2008). Thus, the cell phone location and other circumstantial evidence was not necessarily determinative, but it was relevant because it allowed the jury to infer that Allen had an opportunity to commit the crimes. *Id*.

There was additional circumstantial evidence of Allen's identity as the perpetrator of the crimes in this case. Allen's cell phone data revealed that Allen's cell phone was in Detroit about 30 minutes after the crimes occurred. Smith and Allen continued to exchange several cell phone calls in the hours following the crimes. Indeed, Smith even sent a text message to Allen in which Smith essentially forgave Allen for shooting a gun in his direction. Additionally, Smith was in a gas station in Detroit about 90 minutes after the crimes were committed, and he told the clerk that a gun had been fired in his direction. At that time, both Allen's and Smith's cell phones were "pinging" the cell tower by the gas station. Additionally, Allen had photographs on his cell phone of guns that could have fired the bullet that killed the homicide victim, as well as photographs of Allen carrying those guns, and even one of Allen with a handgun with an extended magazine that matched the robbery victim's description of the weapon used to commit the crimes in this case. "Evidence of a defendant's possession of a weapon of the kind used in the offense with which he is charged is routinely determined by courts to be direct, relevant evidence of his commission of that offense." *People v Hall*, 433 Mich 573, 580-581; 447 NW2d 580 (1989). Furthermore, about two hours after the crimes were committed, several of those photographs were deleted from Allen's cell phone. Also, Allen attempted to delete evidence that he had visited a news website that issued a story about the murder. Allen's actions, which "could be viewed as an effort to destroy evidence

of the crime," allowed for a reasonable juror to infer that Allen had "a consciousness of guilt." *Unger*, 278 Mich App at 226.

Despite being circumstantial, all of that evidence showed that Allen had access to the type of gun that killed the homicide victim, that he had entered an agreement with Smith to rob the homicide victim, that he had actually robbed both victims at gunpoint, that he had shot and killed the homicide victim, and that he had then attempted to cover up his involvement in the crimes. As this Court has held, the prosecution was permitted to prove Allen's identity by evidence that is entirely "circumstantial and sometimes requires reliance on an inference founded on an inference . . . ." *Bass*, 317 Mich App at 264. In this case, however, such reliance is unnecessary where there was also direct evidence of Allen's identity as the perpetrator of the crimes—the robbery victim's photographic and in-person identifications of Allen. Consequently, given all of the direct and circumstantial evidence just discussed, there was sufficient evidence that Allen was the individual who committed the crimes in this case.

Allen also argues that there was insufficient evidence to support his armed robbery conviction because there was no proof that anything was actually stolen from the victims. The record shows that Allen approached the passenger-side window of the homicide victim's vehicle, pointed his gun at the victims, and said, "Let me get everything." The robbery victim testified that Allen was attempting to rob them. Before the theft could be completed, the homicide victim attempted to drive away and was shot, which caused his death and the vehicle he was driving to be overturned. There was no evidence on the record that any larcenous taking by Allen or Smith actually occurred. Even so, Allen's argument lacks merit because determinative and binding Michigan caselaw provides that a defendant "may be guilty of armed robbery even if the larcenous taking is not completed." *Williams*, 491 Mich at 183. Thus, that Allen did not complete the larceny does not require reversal of his convictions. See *id*.

Lastly, Allen contends that there was insufficient evidence to sustain his convictions because he had an alibi. The record supports that at least two of Allen's alibi witnesses specifically testified that Allen was in Detroit at a birthday party at the time the crimes were committed. However, "[t]he prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *Henderson*, 306 Mich App at 9. As discussed, the prosecution presented sufficient evidence that Allen committed the crimes challenged, even though Allen's witnesses stated otherwise. The prosecution was not required to disprove those alibi witnesses. *Id*. Additionally, the prosecution also elicited testimony from the alibi witnesses that Allen was a friend of their family. In other words, they had a previous relationship with Allen. Our Supreme Court has held that an alibi witness's "relationship with the defendant [is] relevant to [their] credibility." *People v Mateo*, 453 Mich 203, 210; 551 NW2d 891 (1996). Therefore, on top of the evidence proving that Allen actually committed the crimes, the prosecution also presented evidence that undermined the alibi witnesses' credibility. *Id*. It was in the province of the jury to believe the prosecution's witnesses instead Allen's alibi witnesses, and this Court will not disturb the jury's credibility determinations. *Hardiman*, 466 Mich at 428. Indeed, any and all conflicts that arise in the evidence must be resolved "in favor of the prosecution." *Henderson*, 306 Mich App at 9. Consequently, this argument by Allen is also without merit. *Id*.

## IV.  SUPPRESSION OF EVIDENCE FROM CELL PHONE

Allen argues that the trial court erred by denying his motion to suppress the data and photographs obtained from his cell phone.  We disagree.

## A.  STANDARD OF REVIEW

"A trial court's findings of fact on a motion to suppress are reviewed for clear error . . . ." *People v Hrlic*, 277 Mich App 260, 262-263; 744 NW2d 221 (2007).  "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *Blevins*, 314 Mich App at 348-349.  "But the application of constitutional standards regarding searches and seizures to essentially uncontested facts is entitled to less deference; for this reason, we review de novo the trial court's ultimate ruling on the motion to suppress." *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005).

## B.  LAW AND ANALYSIS

First, it is important to outline what evidence Allen challenges and what admissions the prosecution essentially makes.  Allen argues that the data from his cell phone should have been suppressed because it was the fruit of the poisonous tree.  The prosecution, on the other hand, effectively admits that the search was unconstitutional under the current standard espoused by the United States Supreme Court, which we discuss below.  Nevertheless, the prosecution argues that because the search was conducted according to federal statutes that were considered constitutional at the time, suppression was not warranted under the good-faith exception to the exclusionary rule, or, alternatively, under the independent-discovery exception to the same rule.  Given the prosecution's essential admission, we will focus our analysis on the exceptions to the rule.

The United States Supreme Court in *Carpenter v United States*, 585 US ___, ___; 138 S Ct 2206, 2213; 201 L Ed 2d 507 (2018) (citations omitted), provided a brief summary of constitutional law related to Fourth Amendment jurisprudence:

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  The "basic purpose of this Amendment," our cases have recognized, "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials."  The Founding generation crafted the Fourth Amendment as a "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity."  In fact, as John Adams recalled, the patriot James Otis's 1761 speech condemning writs of assistance was "the first act of opposition to the arbitrary claims of Great Britain" and helped spark the Revolution itself.

For much of our history, Fourth Amendment search doctrine was "tied to common-law trespass" and focused on whether the Government "obtains information by physically intruding on a constitutionally protected area."  More recently, the Court has recognized that "property rights are not the sole measure of Fourth Amendment violations." . . . [W]e established that "the Fourth Amendment

protects people, not places," and expanded our conception of the Amendment to protect certain expectations of privacy as well. When an individual "seeks to preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as reasonable," we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.

"In *Weeks v United States*, 232 US 383; 34 S Ct 341; 58 L Ed 652 (1914), the United States Supreme Court held that, in a federal prosecution, the Fourth Amendment barred the use of evidence obtained pursuant to an illegal search or seizure." *People v Goldston*, 470 Mich 523, 528; 682 NW2d 479 (2004). "In *Mapp v Ohio*, 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), the United States Supreme Court extended the *Weeks* exclusionary rule to the states." *Goldston*, 470 Mich at 528.

In this case, police obtained Allen's cell phone location information on January 17, 2017, on the basis of an order obtained under the federal Stored Communications Act, 18 USC 2701 *et seq*. Under that statutory scheme, in order to obtain the cellular-location evidence, the police only needed to prove that "there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 USC 2703(d). Using that location evidence, at least in part, the police tracked Allen to a friend's house, surveilled the home, and then arrested Allen as he left. During his arrest, the police seized Allen's cell phone. Later, after obtaining a valid search warrant, the police downloaded and analyzed the data on the cell phone. Much of that evidence was used against Allen during the trial, including text messages, web history, photographs of guns, photographs of Allen with guns, and evidence that some of those items were deleted hours after the crimes were committed.

In *Carpenter*, 585 US at ___; 138 S Ct at 2221, the United States Supreme Court held that "the acquisition of [an individual's cell-site location information (CSLI)] was a search," and thus, "also conclude[d] that the Government must generally obtain a warrant supported by probable cause before acquiring such records." Further, the *Carpenter* Court ruled that the standard of "reasonable grounds" under the Stored Communications Act fell "well short of the probable cause required for a warrant." *Id*. "Consequently, an order issued under Section 2703(d) of the Act is not a permissible mechanism for accessing historical cell-site records." *Carpenter*, 585 US at ___; 138 S Ct at 2221. "Before compelling a wireless carrier to turn over a subscriber's CSLI, the Government's obligation is a familiar one—get a warrant." *Id*.

In this case, the prosecution acknowledges that, under *Carpenter*, the police were required to get a warrant before obtaining and using Allen's cell phone location evidence. Because they failed to do so, the prosecution also acknowledges that the search was unconstitutional. Therefore, the only question remaining for this Court to consider is whether the exclusionary rule should apply.

The prosecution first contends that the good-faith exception to the exclusionary doctrine applies. Our Supreme Court in *Goldston*, 470 Mich at 529, noted that the United States Supreme Court had "clarified that whether the exclusion of evidence is an appropriate sanction in a particular case is a separate issue from whether police misconduct violated a person's Fourth

Amendment rights." The Court in *Goldston*, then provided the following structure for analyzing that question:

> The Court further stated that whether invocation of the "judicially created remedy" is appropriate involves weighing the costs and benefits in each particular case. The primary benefit of the exclusionary rule is that it deters official misconduct by removing incentives to engage in unreasonable searches and seizures. The costs, however, include preventing the use in the prosecutor's case-in-chief of trustworthy evidence obtained in reliance on a search warrant subsequently found to be defective.

> The Court expressed concern that rigid adherence to the exclusionary rule, particularly when law enforcement officers act in good faith or when their transgressions are minor, "offends basic concepts of the criminal justice system" and breeds contempt for the law and the administration of justice. Thus, the Court recognized the potential for the exclusionary rule to impede the truth-seeking function of the judiciary, resulting in guilty parties either evading punishment altogether or receiving favorable plea bargains. The Court concluded that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." [*Goldston*, 470 Mich at 529-530 (citations omitted).]

In sum, "the exclusionary rule should be employed on a case-by-case basis and only where exclusion would further the purpose of deterring police misconduct." *Id*. at 531.

As discussed, however, police reliance on a court order permitting a search must be in "good faith." Consequently, there are limits regarding what orders could be properly relied upon by the police under the good-faith exception. First, the police's reliance on the decision of the court or magistrate must be "objectively reasonable." *Id*. Second, suppression is still warranted where "the issuing magistrate or judge is misled by information in the affidavit that the affiant either knew was false or would have known was false except for his reckless disregard of the truth." *Id*. Finally, "the good-faith exception does not apply where the magistrate wholly abandons his judicial role or where an officer relies on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id*. (quotation marks and citation omitted).

In this case, the police who requested the order and the magistrate who issued the order relied on the Stored Communications Act. At that time, January 17, 2017, the United States Supreme Court had yet to decide *Carpenter*, which was issued on June 22, 2018. In *Illinois v Krull*, 480 US 340, 352; 107 S Ct 1160; 94 L Ed 2d 364 (1987), the United States Supreme Court held that "[t]here is nothing to indicate that applying the exclusionary rule to evidence seized pursuant to [a] statute prior to the declaration of its invalidity will act as a significant, additional deterrent." The good-faith exception as applied to statutes, however, has limitations:

> A statute cannot support objectively reasonable reliance if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional

-14-

laws. Nor can a law enforcement officer be said to have acted in good-faith reliance upon a statute if its provisions are such that a reasonable officer should have known that the statute was unconstitutional. [*Id*. at 355.]

The police's reliance on the Stored Communications Act was objectively reasonable because there was United States Appellate Court caselaw holding that the statute was constitutional. Before the *Carpenter* decision, the United States Circuit Court of Appeals for the Sixth Circuit had held that the Stored Communications Act was constitutional, reasoning that the obtainment of cellular-location evidence did not qualify as a search under the Fourth Amendment. *United States v Carpenter*, 819 F3d 880, 887 (CA 6, 2016), rev'd 585 US ___; 138 S Ct 2206 (2018).[6] Thus, at the time the police used the cellular-location data to find Allen, arrested him, and seized his cell phone, the available constitutional law on the subject indicated that the Stored Communications Act was not suspect. In light of that, the situation presented in this case involves police relying on a federal statute that had been held to pass constitutional muster by the Sixth Circuit Court of Appeals. On the basis of those facts, it is clear that the police's reliance on the Stored Communications Act was objectively reasonable, and thus, the good-faith exception to the exclusionary rule applies in this case. *Krull*, 480 US at 352. Indeed, when the Sixth Circuit heard *Carpenter* on remand, it held similarly: "The district court nevertheless properly denied suppression because the [government] relied in good faith on the [Stored Communications Act] when they obtained the data." *United States v Carpenter (On Remand)*, 926 F3d 313, 318 (CA 6, 2019), vacated on other grounds on rehearing 788 F Appx 364 (CA 6, 2019). We now reach the same conclusion in this case.

## V. PROSECUTORIAL ERROR

Allen, in his Standard 4 brief on appeal, argues that the prosecution committed error requiring reversal. We disagree.

## A. PRESERVATION AND STANDARD OF REVIEW

In cases alleging prosecutorial error, issues are "preserved by contemporaneous objections and requests for curative instructions . . . ." *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017) (quotation marks and citation omitted). Allen contends the prosecution committed error by relying on a falsified affidavit in support of a search warrant. Allen did not object to that

---

[6] The United States Supreme Court extended the good-faith exception to include situations where the police rely on binding judicial precedent before it is overruled. *Davis v United States*, 564 US 229, 241; 131 S Ct 2419; 180 L Ed 2d (2011) ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.") Sixth Circuit precedent, however, is not binding on Michigan courts. *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004), cert den 543 US 870; 125 S Ct 98; 160 L Ed 2d 117 (2004). Thus, while the Sixth Circuit's 2016 decision in *Carpenter* supports the prosecution's allegation that the police's reliance on the federal statutes was objectively reasonable, it does not supply its own grounds for applying the good-faith exception to the exclusionary rule.

alleged incident of prosecutorial error or request a curative instruction during trial. Thus, that allegation is not preserved for this Court's review. *Id.*

"Claims of prosecutorial [error] are generally reviewed de novo to determine whether the defendant was denied a fair trial." *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). However, because this issue has not been preserved for review, this Court must review the "unpreserved claim for plain error affecting [Allen's] substantial rights." *People v Roscoe*, 303 Mich App 633, 648; 846 NW2d 402 (2014).

## B.  LAW AND ANALYSIS

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial [error] is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "We must evaluate instances of prosecutorial [error] on a case-by-case basis, reviewing the prosecutor's [actions] in context and in light of the defendant's arguments." *People v Lane*, 308 Mich App 38, 62-63; 862 NW2d 446 (2014) (citation omitted). "A prosecutor's good-faith effort to admit evidence does not constitute misconduct." *Dobek*, 274 Mich App at 70. This Court has summarized the law regarding allegations that the prosecution relied on perjured testimony to obtain a conviction:

> It is well settled that a conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment. If a conviction is obtained through the knowing use of perjured testimony, it must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Stated differently, a conviction will be reversed and a new trial will be ordered, but only if the tainted evidence is material to the defendant's guilt or punishment. Thus, it is the misconduct's effect on the trial, not the blameworthiness of the prosecutor, which is the crucial inquiry for due process purposes. The entire focus of our analysis must be on the fairness of the trial, not on the prosecutor's or the court's culpability. [*Bass*, 317 Mich App at 272-273 (citation omitted).]

Allen argues that the prosecution knowingly used evidence that was obtained on the basis of a perjured search warrant affidavit from a police officer. The record reveals otherwise. Allen first argues that the police officer lied in the affidavit about the robbery victim identifying him in a photographic lineup. Allen's assertion relies on an allegation that the police officer made the averment before the photographic lineup actually took place. However, a review of the record shows that the robbery victim identified Allen in the photographic lineup on the evening of January 17, 2017, and the affidavit was signed on the morning of January 18, 2017. Thus, there is no factual support for Allen's allegation that a police officer perjured himself in an affidavit.

Allen also contends that the police officer lied in the affidavit by stating that he discovered that the cell phone number used to contact Smith belonged to Allen. The affidavit contained the following statement: "Affiant was able to locate the number in Accurint and it [was] registered to Tyler Allen." Allen asserts that this cannot be true because the cell phone number in question was registered in his mother's name. Allen, however, has not provided any proof in support of his allegation, nor has he provided any evidence that the system, Accurint, relies on cell phone

registration information. Indeed, Allen testified at trial that the cell phone number in question belonged to him and that he had previously been convicted of second-degree home invasion. Thus, it was possible that the police officer found that the cell phone number belonged to Allen because Allen himself provided it to law enforcement after his prior conviction. Absent any factual proof that the statement in the affidavit was not true, this Court has not been provided any ground to determine that there was prosecutorial error. See *Elston*, 462 Mich at 762. Consequently, Allen is not entitled to relief.

## VI. PHOTOGRAPHIC LINEUP

Allen argues that the trial court erred by denying his motion to suppress the robbery victim's identification in an allegedly unduly suggestive photographic lineup. Because Allen has abandoned this issue on appeal, we disagree.

## A. STANDARD OF REVIEW

"A trial court's decision to admit identification evidence will not be reversed unless it is clearly erroneous." *Blevins*, 314 Mich App at 348. "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *Id*. at 348-349.

## B. ABANDONMENT

We conclude that Allen abandoned this issue on appeal by failing to make any argument as to why the photographic lineup was unduly suggestive. Indeed, in his brief on appeal, Allen has not identified a single problem with the photographic lineup that would render it unduly suggestive. Instead, Allen focuses his argument on the alleged unreliability of the robbery victim's memory considering the circumstances of the crime, which was the only time the robbery victim saw the perpetrator of the crime. Specifically, Allen contends that the robbery victim's memory was questionable because the event was stressful, the robbery victim had smoked a significant amount of marijuana before seeing Allen, it was dark outside at the time the crimes were committed, and Allen was otherwise a stranger to the robbery victim. Under the test espoused by our Supreme Court in *People v Gray*, 457 Mich 107, 115; 577 NW2d 92 (1998), however, such questions regarding the witness's memory only affect admissibility after the determination has been made that a photographic lineup was unduly suggestive. This is because once a photographic lineup has been suppressed for that reason, the trial court must next consider whether there is an independent basis for the admission of a witness's *in-court* identification. *Id*. Unless a photographic lineup is determined to be unduly suggestive, issues with a witness's memory and its foundations are only relevant to the weight to be given to the identification, not its admissibility. *Id*.; *Davis*, 241 Mich App at 705.

In light of that, Allen has failed to make any argument regarding why the photographic lineup was unduly suggestive, why it would be inadmissible, or why the robbery victim's in-court identification was inadmissible. Allen is not permitted "to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Bass*, 317 Mich App at 276 (quotation marks and citation omitted). Rather, an "appellant himself must first adequately prime the pump; only then does the appellate well begin

to flow." *Id*. (quotation marks and citation omitted). Thus, Allen has abandoned this issue on appeal, and we need not address it. *Id*. Nonetheless, to the extent that we have considered it, we find that it lacks merit.

## VII. PHOTOGRAPHS OF GUNS

Lastly, Allen asserts the trial court abused its discretion by refusing to exclude photographs of guns and photographs of him holding guns that were removed from his cell phone.[7] Again, we disagree.

## A. STANDARD OF REVIEW

"When the issue is preserved, we review a trial court's decision to admit evidence for an abuse of discretion, but review de novo preliminary questions of law, such as whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *People v Buie*, 491 Mich 294, 320; 817 NW2d 33 (2012). "[W]hen such preliminary questions of law are at issue, it must be borne in mind that it is an abuse of discretion to admit evidence that is inadmissible as a matter of law." *Henry*, 315 Mich App at 143, quoting *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

## B. LAW AND ANALYSIS

Generally, "[a]ll relevant evidence is admissible . . . ." MRE 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Even where evidence is considered to be relevant, the evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403. Notably, MRE 403 does not regulate evidence that is simply "prejudicial" because "[a]ll relevant and material evidence is prejudicial." *People v Sharpe*, 502 Mich 313, 333; 918 NW2d 504 (2018). Rather, "[i]t is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995).

There is, therefore, a two-part test: "First, this Court must decide whether introduction of [the] evidence at trial was unfairly prejudicial. Then, this Court must apply the balancing test and weigh the probativeness or relevance of the evidence against the unfair prejudice." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (quotation marks and citation omitted). "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Gipson*, 287 Mich App 261, 263; 787 NW2d 126 (2010), quoting *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). Stated differently, the "major function [of MRE 403]

---

[7] Allen also argues that the admission of this evidence denied him a fair trial. However, because Allen has fully abandoned the constitutional argument on appeal, we need not address the argument.

is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect . . . ." *Mills*, 450 Mich at 75 (quotation marks omitted). Such concerns arise where "the tendency of the proposed evidence [is] to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *Cameron*, 291 Mich App at 611 (quotation marks and citations omitted). Additional concerns include "the danger of confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *People v Watkins*, 491 Mich 450, 489; 818 NW2d 296 (2012) (quotation marks and citation omitted).

" 'Photographic evidence is generally admissible as long as it is relevant, MRE 401, and not unduly prejudicial, MRE 403.' " *Brown*, 326 Mich App at 192, quoting *Gayheart*, 285 Mich App at 227. "Photographs are not excludable simply because a witness can orally testify about the information contained in the photographs." *Mills*, 450 Mich at 76. "Photographs that are merely calculated to arouse the sympathies or prejudices of the jury are properly excluded, particularly if they are not substantially necessary or instructive to show material facts or conditions." *Id*. at 76-77, quoting *People v Eddington*, 387 Mich 551, 562-563; 198 NW2d 297 (1972). "The determination whether evidence should be excluded pursuant to MRE 403 is best left to the trial court's contemporaneous assessment." *Gipson*, 287 Mich App at 261. "Evidence of a defendant's possession of a weapon of the kind used in the offense with which he is charged is routinely determined by courts to be direct, relevant evidence of his commission of that offense." *Hall*, 433 Mich at 580-581.

Allen essentially argues that the trial court should have excluded all of the photographs of guns but for two that showed a Glock model handgun in an open palm. We have reviewed all of those photographs as presented to the jury and hold that Allen's argument is without merit. We must first analyze whether the photographs challenged by Allen were "unfairly prejudicial." *Cameron*, 291 Mich App at 611. We initially address the photographs of Allen holding guns. There were 11 photographs admitted that showed a portion of Allen's face along with him holding a gun. For those photographs, there was testimony that the weapons were either .45-caliber weapons or Glocks. There was expert testimony that the homicide victim was killed with a .45-caliber bullet that was fired from a handgun capable of firing such a bullet, most likely a Glock or Bersa brand gun. Consequently, those 11 photographs were direct evidence that Allen had access to and, at some point, possessed guns that could have been used to kill the homicide victim. As our Supreme Court has held, "[e]vidence of a defendant's possession of a weapon of the kind used in the offense with which he is charged is routinely determined by courts to be direct, relevant evidence of his commission of that offense." *Hall*, 433 Mich at 580-581. Considering the direct and relevant nature of those 11 photographs, there is nothing in the record to suggest that they were, in any way, "merely calculated to arouse the sympathies or prejudices of the jury," which would have rendered them *unfairly* prejudicial. *Mills*, 450 Mich at 76-77 (quotation marks and citation omitted); *Hall*, 433 Mich at 580-581.

Furthermore, considering that identity and Allen's possession of the cell phone were significant issues presented at trial, the different angles of Allen's face in each photograph was particularly relevant in this case. Thus, the number of photographs did not amount to the "needless presentation of cumulative evidence," which is often indicative of unfair prejudice. *Watkins*, 491 Mich at 489 (quotation marks omitted).

-19-

Next, Allen challenges the photographs that showed three guns on a pink pillowcase. Initially, the prosecution intended to admit those photographs, but showing five different guns. When the trial court indicated that it would exclude those photographs under MRE 403, the prosecution offered to crop the photographs. In doing so, only three guns remained visible. The cropped versions of the photographs were admitted at trial. Allen contends that evidence of those three guns, which are not Glocks or Bersas, was unfairly prejudicial because they could not have fired the bullet that killed the homicide victim. However, the firearms and tool-mark analysis expert prepared a report that revealed that, while those two companies manufactured the brand of gun that most likely fired the bullet that killed the homicide victim, "[n]o suspected firearm should be overlooked." Thus, the three guns in the photographs remained relevant, as those that could potentially have been used to complete the commission of the crimes. *Hall*, 433 Mich at 580-581.

While the photographs were prejudicial, as is most relevant evidence, there was no reason to believe that the photographs were *unfairly* prejudicial. The crimes charged were first-degree felony murder, armed robbery, conspiracy to commit armed robbery, AWIM, and felony-firearm. The evidence of the use of a gun was necessary to prove some of those charges and relevant to proving all of them. There was no indication on the record that the photographs of the guns were "merely calculated to arouse the sympathies or prejudices of the jury," which would have suggested that they were *unfairly* prejudicial. *Mills*, 450 Mich at 76-77 (quotation marks and citation omitted). Rather, because the crimes charged involved guns, the jurors would not have been shocked or angered by evidence of guns, except to the extent that they may have believed those guns were used in the armed robbery and murder. *Cameron*, 291 Mich App at 611. Consequently, the photographs of the three guns on the pillowcase were not unfairly prejudicial, and thus, this argument lacks merit. *Id*.

Furthermore, even to the extent that there might have been some slight unfair prejudice, there is nothing in the record to suggest that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. *Mills*, 450 Mich at 75. As discussed, proof of Allen's access to and possession of guns was highly relevant for the crimes of which he was charged. Moreover, evidence that Allen had photographs of guns on his cell phone, especially those that may have fired the shot that killed the homicide victim, was highly probative of the issues of Allen's access to and possession of guns. That probative value was further enhanced by proof that Allen deleted some of the photographs about two hours after the crimes were committed. Therefore, in light of the significant probative value of the evidence, the trial court did not abuse its discretion in determining that it was substantially outweighed by the danger of unfair prejudice. *Id*. Thus, for both reasons, this argument is without merit.

Affirmed.

/s/ Kathleen Jansen
/s/ Patrick M. Meter
/s/ Thomas C. Cameron

-20-